Thomas M. Rogers (No. 003285)
Meenoo Chahbazi (No. 029568)
ROBAINA & KRESIN PLLC
5343 N. 16th Street, Suite 200
Phoenix, Arizona 85016
Telephone: (602) 682-6450
Facsimile: (602) 682-6455
Tom@thomasmrogers.com
mch@robainalaw.com

Attorneys for Plaintiff Lydia Garcia

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| | |
|---|---|
| Lydia Garcia, an individual,<br><br>　　　　　Plaintiff,<br><br>vs.<br><br>Banner Health,<br><br>　　　　　Defendant. | No.<br><br>**COMPLAINT**<br><br>**(Family and Medical Leave Act and Rehabilitation Act)**<br><br>**(Jury Trial Demanded)** |

Plaintiff Lydia Garcia, by and through her counsel, alleges as follows:

1. This action is brought pursuant to the Family and Medical Leave Act, 29 U.S.C. 29 U.S.C. §2601 *et seq.* ("the FMLA") and the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* ("the Rehabilitation Act").

**PARTIES**

2. Plaintiff Lydia Garcia is a resident of Maricopa County, Arizona.

3. Defendant Banner Health ("Banner") is an Arizona nonprofit health system that is based in Phoenix, Arizona.

4. Banner operates over 20 hospitals and several specialized facilities across six states, including Arizona.

5. Banner has over 39,000 employees.

6. Banner is one of the largest health care systems in the country.

7. Ms. Garcia began her employment with Banner in 1974 and has worked

1  for Banner for over 42 years.

2      8.     Banner receives and distributes federal financial funding.

3      9.     Banner principally engages in the business of providing health care.

## JURISDICTION

5      10.    The Court has jurisdiction over this case pursuant to 29 U.S.C. § 2617(a)(2) and 28 U.S.C. §§ 1331, 1332 and 1367.

7      11.    Venue is proper in the District of Arizona pursuant to 28 U.S.C. § 1391.

## GENERAL ALLEGATIONS

9      12.    During the course of her employment, Ms. Garcia ascended to the position of Contract Management Specialist, a job that she held from approximately the mid-1990's until April 2015.

12      13.    Ms. Garcia received numerous accolades for her performance as a Contract Management Specialist.

14      14.    On or about March 3, 2015, Ms. Garcia was hospitalized at a Banner hospital due to severe chest pain and elevated blood pressure.

16      15.    Ms. Garcia promptly notified her supervisor of her hospitalization and kept her informed of her medical progress and intent to return to work as soon as she was released by her doctors.

19      16.    After acquiring knowledge regarding Ms. Garcia's hospitalization and health condition, Banner failed to inform Ms. Garcia whether her leave would be designated as FMLA leave within five business days. 29 C.F.R. § 825.300.

22      17.    Banner failed to provide written notice detailing the specific expectations and obligations of the employee under the FMLA and explaining any consequences of a failure to meet these obligations. 29 C.F.R. § 825.300(c).

25      18.    Banner failed to provide notice specifying:

        a.    That the leave may be designated and counted against the employee's annual FMLA leave entitlement if qualifying (See §§

825.300(c) and 825.301) and the applicable 12-month period for FMLA entitlement (See §§ 825.127(c), 825.200(b), (f), and (g));

b. Any requirements for the employee to furnish certification of a serious health condition, serious injury or illness, or qualifying exigency arising out of covered active duty or call to covered active duty status, and the consequences of failing to do so (See §§ 825.305, 825.309, 825.310, 825.313);

c. The employee's right to substitute paid leave, whether the employer will require the substitution of paid leave, the conditions related to any substitution, and the employee's entitlement to take unpaid FMLA leave if the employee does not meet the conditions for paid leave (See § 825.207);

d. Any requirement for the employee to make any premium payments to maintain health benefits and the arrangements for making such payments (See § 825.210), and the possible consequences of failure to make such payments on a timely basis (i.e., the circumstances under which coverage may lapse);

e. The employee's status as a key employee and the potential consequence that restoration may be denied following FMLA leave, explaining the conditions required for such denial (See § 825.218);

f. The employee's rights to maintenance of benefits during the FMLA leave and restoration to the same or an equivalent job upon return from FMLA leave (as set forth in §§ 825.214 and 825.604); and

g. The employee's potential liability for payment of health insurance premiums paid by the employer during the employee's unpaid FMLA leave if the employee fails to return to work after taking FMLA leave (See § 825.213).

- 3 -

19. Ms. Garcia returned from medical leave on March 16, 2015.

20. On March 27, Ms. Garcia requested reasonable accommodations by providing to Banner medical documentation from her primary care physician stating that she had been diagnosed with chest pain and hypertension, that she had recently been hospitalized due to these conditions, and that based on her medical condition she needed to be able to work a reasonable schedule not to exceed 40 hours a week and that she also needed to use some of her accumulated paid time off (PTO) leave so that she could recover her health.

21. On or about April 6, 2015, Ms. Garcia met with her supervisor, Lori Andersen, and a Human Resources (HR) representative, Matt Small, Employee Relations Consultant, about her request for reasonable accommodations for her disability and requested a reallocation of some of her work responsibilities to allow her to work 40 hours a week and take five PTO leave days per month and additional PTO leave, as necessary.

22. After receiving information about Ms. Garcia's medical condition and need for leave, Banner again failed to notify Ms. Garcia whether her leave would be designated as FMLA leave within five business days. 29 C.F.R. §825.300.

23. Banner also again failed to provide Ms. Garcia with notice regarding her rights and responsibilities under the FMLA.

24. On or about April 10, 2015, HR denied Ms. Garcia's request for reasonable accommodations.

25. HR Representative Small told Ms. Garcia that 40 hours a week was not reasonable for her position, even though her colleague, Jim Hight, who is also a Contract Management Specialist in the Managed Care Programs Department, regularly worked 40 hours a week or less and had done so for many years.  Mr. Hight was regularly assigned a less demanding workload than Ms. Garcia.

26. Additionally, Ms. Garcia's supervisor, Ms. Andersen, had previously stated during verbal discussions and in email communications that "the expectations in

Managed Care have always been that you try and stay within your 40 hour work week. It is important that you have a work/home balance."

27. After denying Ms. Garcia's accommodations request on April 10, 2015, Banner failed to offer any alternative accommodations to Ms. Garcia to allow her to remain in her position.

28. Banner failed to offer Ms. Garcia the ability to take intermittent leave or a reduced leave schedule to accommodate her disability so that she could remain in her current position and work 40 hours a week and take her accumulated PTO.

29. During the April 10, 2015 meeting with HR, the only accommodation that Banner offered Ms. Garcia was reassignment.

30. During a follow-up phone conversation with HR on April 10, HR Representative Small also told Ms. Garcia that she would have only 30 days to apply, be interviewed, and obtain a new job at Banner through HR (not the usual application procedures) or Ms. Garcia would be terminated.

31. HR Representative Small told Ms. Garcia that she would be terminated if she did not accept reassignment, despite the fact that she did not know where Banner would reassign her.

32. HR Representative Small informed Ms. Garcia that it was up to her to locate possible job openings, but he required that any jobs Ms. Garcia found were to be brought to HR Representative Small's attention and that "he," not the Hiring Manager, would determine whether Ms. Garcia was qualified to apply. He firmly instructed that Ms. Garcia was *not* to apply for positions independently and must go through Banner's "meet and greet" process for "disabled employees" who needed to transfer into different positions.

33. On April 17, Banner ended Ms. Garcia's employment as a Contract Management Specialist (CMS) in the Managed Care Programs Department and involuntarily transferred Ms. Garcia to a temporary light duty position supporting the financial analysts in the Transplant and Liver Disease Center beginning on April 23,

- 5 -

2015. While on light duty, Ms. Garcia was required to search for a new, permanent job at Banner.

34. Garcia had previously, on April 10, 2015, applied for two vacant CMS positions in the Legal Department.

35. The CMS employees in the Legal Department regularly work 40 hours a week. When Ms. Garcia told HR of her independent application to work in the Legal Department, which occurred before she received HR's instructions, HR Representative Small became upset, chided her, and said "he" would address Ms. Garcia's on-line application with the HR Recruiter.

36. HR Representative Small then arranged for a "meet and greet" on April 15, 2015 with the Legal Department's hiring supervisor and Legal Operations Director, Beth Avant, and HR Representative Suzy Snodgrass.

37. During the meet and greet, Ms. Snodgrass inquired about the workhours schedule required for CMS's employed in the Legal department and Ms. Avant confirmed that all CMS's are required to work a 40-hour work week.

38. A few days later, HR Representative Small informed Ms. Garcia that the two Legal CMS positions in Phoenix were suddenly no longer available and would not be filled due to "business needs."

39. Upon information and belief, Banner actually filled the vacant CMS positions in Legal with other candidates from outside of the company despite having conducted a successful meet and greet on April 15, 2015 with Ms. Garcia, Ms. Avant and HR's Ms. Snodgrass.

40. In a May 6, 2015 email to HR Representative Small, Ms. Garcia requested that Banner reconsider and allow her to work a 40-hour a week schedule with the opportunity to use accumulated PTO in her current position at the Transplant Center or another department with contracting requirements, as needed, for a temporary period of four months. Banner never responded to this request.

41. In a May 13, 2015 email to HR Representative Small, Ms. Garcia

reiterated her plea that "as an alternative accommodation under the ADA -- that for a temporary period of four months, Banner allow [her] to work a 40-hour-per-week schedule with PTO, as needed, in [her] current position at the Transplant Center or another department with contracting requirements."

42. Rather than helping her find a position with equivalent pay and job responsibilities in a similar location, HR Representative Small suggested on or about May 8, 2015, that Ms. Garcia consider a position with "much less pay," which was also an hour commute from her home.

43. The position recommended by HR would have resulted in a significant pay cut believed to be about 38 percent.

44. When Ms. Garcia requested to apply for a higher paying CMS Research position in the Legal department for which there was a current job announcement and which included similar pay and responsibilities as Ms. Garcia's previous CMS position in the Managed Care Programs Department, HR Representative Small told Ms. Garcia that she could not apply for the position because the CMS Research position required over 40 hours a week.

45. However, upon information and belief, the CMS Research position did not require more than 40 hours a week.

46. On or about May 13, 2015, after Ms. Garcia pleaded to HR Representative Small for an extension, Banner extended Ms. Garcia's deadline to find another position, but only for another 30 days.

47. On June 5, 2015, Ms. Garcia was released by her Primary Care Physician to work over 40 hours a week.

48. Ms. Garcia provided HR Representative Small with a copy of the release on the following Monday, June 8, 2015.

49. Given that Ms. Garcia could now work overtime in addition to 40 hours per week, on June 8th and June 12th, Ms. Garcia requested that Banner allow her to return to her previous CMS position in the Managed Care Programs Department.

50. This was also within the time period where Ms. Garcia should have been entitled to return to her former position or an equivalent position pursuant to the FMLA.

51. Also on June 8, in light of Ms. Garcia's doctor's release, she again requested to apply for the CMS Research position for which there was a current job announcement.

52. But, again, HR Representative Small denied Ms. Garcia the ability to apply for a CMS Research position in the Legal Department through the "meet and greet" process, this time stating that Ms. Garcia was allegedly not qualified for the position because she did not have 15-20 years of research experience.

53. However, the job posting made no reference to the requirement that candidates have 15-20 years of research experience.

54. Legal Operations Director Beth Avant wrote in a June 12, 2015 email:

> Gina Sciara, CMS at Corporate, has submitted her resignation. Gina relayed that she has been offered a position opportunity outside of Banner and has decided to accept the position. Gina's last day will be Friday, June 26th. I'll submit the request for a replacement through vacancy management so that we can fill the position as quickly as possible, however, I believe the position will not be posted until after June 20th.

55. When on June 12, 2015, Banner received notice that the CMS Corporate position filled by Gina Sciara would become vacant, Ms. Garcia should have been placed directly into the position because, as she had been repeatedly told by CMS's employed within the Legal department and as confirmed by Legal Operations Director Beth Avant, the CMS position at Corporate was a 40-hour-per-week position.

56. Moreover, Ms. Garcia had already submitted her doctor's release allowing her to work over 40 hours a week.

57. Additionally, the position had the same exact job description as her previous position and she was fully qualified for the position.

58. However, Banner failed to place Ms. Garcia into this position, despite the fact that Banner was required under the Rehabilitation Act and FMLA to place Ms.

- 8 -

Garcia into this position upon receiving notice of Ms. Sciara's resignation. CMS Gina Sciara's last day of work was on or about June 26, 2015. However, rather than placing Ms. Garcia in this position, Banner remained in communication with Ms. Sciara and placed her back into her position at Banner after Ms. Sciara had terminated her employment and started a new job.

59. Once again, within a week or so, Ms. Garcia was informed that the Legal CMS position in Corporate was no longer available. Upon information and belief, instead of placing Ms. Garcia in that CMS Legal vacancy, Banner actually recruited the former Legal CMS employee, Gina Sciara – who had already resigned and started a new positon with another employer – to return to her former Legal CMS position (a position Ms. Sciara had held approximately two months).

60. On or about June 17, 2015, HR Representative Small denied Ms. Garcia's request to return to her previous position in Managed Care Programs stating that the position had already been filled.

61. However, upon information and belief, one of the individuals assigned to take on Ms. Garcia's former responsibilities, Marissa Castro, was hired on or about July 24, 2015; therefore, Ms. Garcia could have been placed back in her previous CMS position in Managed Care Programs on or about June 17, 2015.

62. Also on June 17, 2015, HR Representative Small informed Ms. Garcia that she would no longer be able to work at the Transplant Center, despite the fact that her supervisor there had hoped to retain her as a permanent employee and she was now released by her doctor to work overtime.

63. On June 17, Banner (HR Representative Small) told Ms. Garcia that she had to stop work entirely and forced her to use her accumulated PTO leave while she continued looking for jobs. Further, Ms. Garcia was again informed that she faced termination in 30 days if she did not find a new position.

64. On June 17, 2015, HR Representative Small authorized Ms. Garcia to apply on line for positions as well as having the possibility of applying through the meet

and greet process for specific positions that HR approved. However, Ms. Garcia continued to apply for approximately ten CMS openings within Banner, to no avail.

65. On June 26, 2016, Ms. Garcia emailed HR Representative Small and asserted that she had been denied the required notice under the FMLA and that Banner should have allowed her to take intermittent leave under the FMLA so that she could return to her former position as a CMS or an equivalent position.

66. Ms. Garcia stated to HR Representative Small:

> When I was hospitalized in March I promptly notified Banner. When reviewing the Banner FMLA policy, I note that I did comply with the notice procedure in Section IV by giving notice "as soon as practical." Initially, upon my arrival at the ER, I asked my co-worker, Eva Gomez, to notify my direct supervisor, Lori Andersen, regarding my leave, and the following morning (in Observation), I left a voice-mail message for Lori, regarding my need for leave and I also asked Eva to again let Lori know I was in the hospital. Upon my discharge from the hospital I both spoke with and had email communications with Lori about my serious health condition, hospitalization and need for leave almost immediately. I provided my health providers' instruction as to my care needs.
>
> Since then you and I have had several discussions about my need for intermittent leave from overtime hours in order to follow my doctors' orders to get my health back and I notified you promptly when my doctor released me back to work in my old position or other positions that have likely overtime (your expressed concern with my ADA request—related to working overtime—having been addressed in my doctor's note, which I provided to you). The Banner policy states that upon my release to return to work, that I am to be returned to my "same or an equivalent position."
>
> Because you informed me I would not be returned to my same position and insist that I cannot work and must use my PTO for 30 days and will be terminated if I do not find a position within Banner in 30 days, I went online and tried to get information to help me understand how Banner would fill my position and refuse to place me in an equivalent position. First, I found out that when I told Banner about my need for leave, that Banner was supposed to provide me a written response explaining my FMLA rights within 5 days. (Please see the attached Fact Sheet from the Department of Labor so you can see what I am referring to.) I never received any

> notice regarding my leave as "FMLA-qualifying" as the Fact Sheet says is required. Nor did I ever receive any notice whatsoever, written or oral, that there was any reason for my ineligibility from FMLA leave and right to return to my same or an equivalent position. I noted that there is even a form of notice (WH-382) on the Department's website: www.dol.gov/whd/forms but I was never provided the information on that form. Please tell me why I was not provided that information and why my job or an equivalent position was not something available to me upon my release back full time and then full time plus overtime?

67. Rather than taking seriously Ms. Garcia's plea regarding her rights under the FMLA, on July 15, 2015, HR Representative Small told Ms. Garcia that she would receive one final 30-day extension and that she would be terminated on August 22nd if she was not transferred into another Banner position before then.

68. On July 29, 2015, Ms. Garcia received an email from "Banner Health No Reply" stating: "Thank you for submitting your recent application for the Contracts Management Specialist Research (141816) position with Banner Research. There was tremendous interest in this position by excellent candidates like you. Though your qualifications are impressive, we were able to find candidates whose backgrounds even more closely match this current need and are therefore no longer considering you for this position."

69. On July 30, 2015, Ms. Garcia received a call from Transplant Center Supervisor, Chris Eckels, who inquired whether she would be interested in either of two upcoming vacancies in her department. Ms. Garcia responded affirmatively and Ms. Eckels said that she didn't want to jeopardize anything Ms. Garcia had going with HR so she would check with HR and follow up with Ms. Garcia on the specifics. Ms. Garcia never heard back from Ms. Eckels, even though Ms. Garcia tried following up with Ms. Eckels directly in person and by phone.

70. On July 31, 2015, HR Representative Small recommended that Ms. Garcia accept a demotion to a Contract Coordinator, Sr. (Sr.CC) position in the Legal Department. Ms. Garcia had repeatedly requested a position equivalent to her previous

CMS position. On August 13, 2015, HR Representative Small advised Ms. Garcia that her leave would end on August 23rd stating: "I don't think that we would extend the leave further. Then it would result in termination." After Ms. Garcia had made several unsuccessful attempts to secure a CMS position, and in light of the approaching 30-day deadline on August 23 and HR Representative Small's statement that there was no other equivalent position available at the time, this significant demotion to Sr.CC position (approximately $23K/year pay cut), was Ms. Garcia's only option and she felt forced to accept it.

71. After Ms. Garcia was demoted to a Sr.CC position in Legal on August 24, 2015, Banner continued to discriminate and retaliate against her.

72. Ms. Garcia continued to apply for CMS positions after her demotion; however, Banner did not give her application the consideration it deserved, in violation of the Rehabilitation Act, and repeatedly denied her the ability to return to a CMS position.

73. In contrast, on or about October 26, 2015, another Sr.CC, Dawn Sacco, was promoted to a CMS position, without any job announcement to allow others to compete for the position.

74. On or about January 12, 2016, Ms. Garcia applied for CMS Legal vacancies posted as Announcement No. 155939; however, she was denied these positions.

75. One vacancy was filled with a fellow Sr.CC, Rita Wildman, and the other by external candidate Stella Weeks.

76. On April 5, 2016, Ms. Garcia applied for another CMS Research vacancy, Announcement No. 161182, but she was not selected for the position. Banner hired external candidate Lauri Anderson (no relation to Lori Andersen) who joined Research on July 11, 2016. Banner attorney Jeremy Stoloff, stated that "Lauri Anderson has no clinical research experience, but she has 10 years contracting experience at NAU." Despite Ms. Garcia's more than 20 years of contracting experience at Banner she was

- 12 -

again passed over for this position and denied the ability to return to a CMS position.

77. After demoting Ms. Garcia, Banner continued to discriminate against Ms. Garcia and subjected her to ongoing harassment, including giving her lower performance evaluations than she deserved, withholding the training that Ms. Garcia requested and needed to do her job, and subjecting her to caustic, belittling remarks.

78. Ms. Garcia's supervisor, Lisa Fain, repeatedly subjected her to harassment by berating her, interfering with her ability to work, and belittling her.

79. In March, 2016, Ms. Fain gave Ms. Garcia a lower performance evaluation than she deserved.

80. Ms. Garcia was then transferred to yet a different position as a Sr.CC in the Research department on March 9, 2016, and was denied adequate training regarding the new position.

81. Her scheduled Research training with her supervisor, Lisa Fain was repeatedly cancelled.

82. The Sr.CC function in Research is divided into two primary roles:

    a. One Sr.CC manages contract submissions (e.g., assures appropriate, editable documentation has been provided, efiles documentation, updates LMS and/or Huron Click and cross references as appropriate, conducts and efiles sanction checks, prepares contract files for review by the CMS team, etc.); and

    b. One Sr.CC manages contract executions (e.g., obtains signatures—original or via scan or DocuSign—on final documents, disseminates to contracting parties, finance and others, updates Fortis, LMS and/or Huron Click, efiles, paper files, etc.)

83. When Ms. Garcia was transferred to Research, she was initially assigned a responsibility involving "execution" responsibilities for contracts. She requested expedited training regarding a different responsibility, "submission", from Sr.CC, Tonia Duncan on or about March 28, 2016, however Ms. Duncan unexpectedly went on leave

due to a family emergency on April 2, 2016, and Ms. Garcia never received this training.

84. On April 6, 2016, Ms. Fain assigned Ms. Garcia to assume Ms. Duncan's submissions-management role. Ms. Garcia requested additional training to no avail.

85. She was then given a Corrective Action Plan with respect to submission on May 4, 2016, after she had just recently taken over this responsibility from Ms. Duncan, without receiving adequate training, less than a month earlier on April 6, 2016.

86. After Ms. Garcia's supervisor repeatedly denied her adequate training and she was placed on Corrective Action, Ms. Garcia convinced another manager to ask the employee who previously held her position to prepare a training tool to facilitate Ms. Garcia's understanding of the necessary steps and actions of the submissions process. After receiving the training tool, Ms. Garcia received additional accolades from staff, and even her supervisor, Ms. Fain, acknowledged that she has been keeping caught up on her submissions work on a consistent basis. Given her supervisor's positive acknowledgement regarding her performance with respect to submissions, which was the main focus of the Corrective Action, Ms. Garcia requested that the Corrective Action be lifted. She also asked HR to rescind the Corrective Action. However, Banner has refused her request to rescind the Corrective Action.

87. Additionally, Ms. Garcia was set up for further disciplinary action.

88. She is currently asked to handle two full-time jobs, as she is the only Sr.CC remaining in Research.

89. Banner recently announced that it will not fill the vacancy in the Sr.CC Research position.

90. Therefore, Ms. Garcia continues to be the sole Sr.CC responsible for completing the work for two full-time positions. Neither of her two Sr.CC predecessors in Research were able to handle both roles (submissions and executions) alone.

91. Moreover, Ms. Garcia has been asked to do additional work that was not done by the other Sr.CC's when they assisted with executions. Ms. Garcia is happy to

do this additional work. However, her productivity is unfairly judged when compared to others who were allowed to take shortcuts and not follow the submissions process she was told to follow.

92. On or about February 17, 2017, Ms. Garcia was again given a lower performance evaluation than she deserved, despite receiving extensive praise from her co-workers for her work performance.

93. Unfortunately, rather than providing Ms. Garcia equal employment opportunities and her FMLA rights, Banner has continued to subject Ms. Garcia to discrimination and harassment and target her for termination.

94. Additionally, to Ms. Garcia's knowledge, Banner did not and does not properly post notices regarding employee rights under the FMLA or the laws enforced by the EEOC.

## **COUNT ONE**

### **(Interference with Rights under the FMLA)**

95. Plaintiff incorporates all previous allegations as though set forth fully herein.

96. At all relevant times, Defendant was an employer within the meaning of the FMLA.

97. At all relevant times, Plaintiff was an eligible employee within the meaning of the FMLA.

98. Defendant failed to post notices in conspicuous places explaining the FMLA provisions as required by 29 C.F.R. §825.300.

99. Defendant violated the FMLA by failing to notify Ms. Garcia regarding whether her leave would be designated as FMLA leave within five business days following Ms. Garcia's hospitalization on or about March 3, 2015. 29 C.F.R. §825.300.

100. Defendant further violated the FMLA by failing to provide Ms. Garcia with written notice of her rights and responsibilities under the FMLA at the same time she was required to receive notice regarding her eligibility for FMLA. 29 C.F.R. §

825.300.

101. After Ms. Garcia returned to work and submitted a request for reasonable accommodations to limit her working hours to 40 hours a week and take intermittent leave, along with a doctor's note describing her medical condition and recent hospitalization, Defendant violated the FMLA by failing to provide Ms. Garcia with notice regarding her eligibility for FMLA and her ability to use FMLA leave to limit her working hours for a period totaling up to 12 workweeks.  Defendant also failed to provide Ms. Garcia with written notice of her rights and responsibilities under the FMLA.

102. An employee need not "expressly assert rights under the FMLA or even mention the FMLA." 29 C.F.R. § 825.302(d). An employee need only give notice regarding the reasons and need for the leave. 29 C.F.R. § 825.301 (b).

103. The employer bears the responsibility of determining whether an employee's leave request is covered by the Act and must notify the employee accordingly. If the employer lacks sufficient information to determine whether an employee's leave (including leave taken in the form of a reduced schedule) qualifies under the FMLA, the employer should inquire further in order to ascertain whether the FMLA applies.

104. The FMLA permits leave to be taken "intermittently or on a reduced leave schedule when medically necessary." 29 U.S.C. § 2612(b)(1). "A reduced leave schedule is a leave schedule that reduces an employee's usual number of working hours per workweek or hours per workday" and intermittent leave is "taken in separate blocks of time due to a single qualifying reason." 29 C.F.R. § 825.202(a).

105. Defendant violated the FMLA by failing to allow Ms. Garcia to take intermittent leave or a reduced leave schedule when she alerted Defendant to her medical condition and need to work a 40 hour work-week and take intermittent leave.

106. "An employer may not change the essential functions of the job in order to deny FMLA leave." 29 C.F.R. § 825.702(d); see also 29 C.F.R. § 825.220(b).

- 16 -

107. An employee may accept "a light duty assignment while recovering from a serious health condition." 29 C.F.R. § 825.220(b); see also § 825.702(d). "An employee's acceptance of such light duty assignment does not constitute a waiver of the employee's prospective rights, including the right to be restored to the same position the employee held at the time the employee's FMLA leave commenced or to an equivalent position." 29 C.F.R. § 825.220(b).

108. Defendant violated the FMLA by failing to allow Ms. Garcia to remain or to be restored in her position as a Contract Management Specialist or an equivalent position.

109. Instead, Banner demoted Ms. Garcia from her position as a CMS to a significantly lower paying position as a Sr.CC.

110. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT TWO**

**(Discrimination in violation of the FMLA)**

111. Plaintiff incorporates all previous allegations as though set forth fully herein.

112. Defendant subjected Ms. Garcia to lower performance reviews than she deserved, disciplinary action, and different terms and conditions of employment because she asserted that Defendant had denied her rights under the FMLA, including her right to intermittent leave and her right to return to a CMS position.

113. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT THREE**

**(Denial of Reasonable Accommodations in Violation of the Rehabilitation Act)**

114. Plaintiff incorporates all previous allegations as though set forth fully

herein.

115. Defendant is subject to the requirements and strictures of the Rehabilitation Act pursuant to 29 U.S.C. § 794.

116. During her employment with Defendant, Plaintiff was an individual with a disability under the Rehabilitation Act in that at all relevant times she had a physical impairment that substantially limited one or more major life activities.

117. At all times during her employment with Defendant, Plaintiff could perform the essential functions of the job she was hired to perform, with or without a reasonable accommodation.

118. At all relevant times, Defendant knew of Plaintiff's disability.

119. Plaintiff's requested accommodations were not an undue hardship to Defendant.

120. Defendant failed to provide Plaintiff with reasonable accommodations of her disability.

121. Subsequently, Defendant demoted Plaintiff and gave her lower performance evaluations than she deserved, and disciplined her by placing her on a Corrective Action because of her disability and need for reasonable accommodations.

122. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

**COUNT FOUR**

**(Disability Discrimination and Harassment in Violation of the Rehabilitation Act)**

123. Plaintiff incorporates by reference all previous allegations as though set forth fully herein.

124. Defendant discriminated against Plaintiff in violation of the Rehabilitation Act by denying Plaintiff's requests for reasonable accommodations.

125. Defendants further discriminated against Plaintiff in violation of the Rehabilitation Act by failing to provide her with FMLA intermittent leave as a

reasonable accommodation.

126. Defendants additionally discriminated against Plaintiff in violation of the Rehabilitation Act by demoting her because of her disability and need for reasonable accommodations.

127. Defendant subsequently discriminated against Plaintiff in violation of the Rehabilitation Act by giving her lower performance evaluations than she deserved and subjecting her to Corrective Action because of her disability and need for reasonable accommodations.

128. Defendant subjected Plaintiff to severe and pervasive harassment because of her medical condition.

129. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life, and other monetary and non-monetary benefits due to her.

## COUNT FIVE

### (**Retaliation and Harassment under the Rehabilitation Act**)

130. Plaintiff incorporates all previous allegations as though set forth fully herein.

131. Defendant retaliated against Plaintiff and subjected her to retaliatory harassment in violation of the Rehabilitation Act because she engaged in protected activity.

132. Defendant demoted Plaintiff, gave her low performance evaluations, and disciplined her by subjecting her to Corrective Action because she engaged in protected activity, in violation of the Rehabilitation Act.

133. As a result of Defendant's conduct, Plaintiff has suffered and continues to suffer lost income, lost fringe benefits, mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation and loss of enjoyment of life.

///

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays for judgment against Defendant as follows:

    A.    For an award of economic damages in an amount sufficient to make Plaintiff whole for past and future lost income and benefits and other economic losses suffered by Plaintiff resulting from Defendant's conduct;

    B.    For an award of compensatory damages for mental anguish, emotional distress, pain and suffering, humiliation, inconvenience, harm to reputation, loss of enjoyment of life and other losses incurred by Plaintiff as a result of Defendant's conduct;

    C.    For an award of liquidated damages under the FMLA;

    D.    For an award of attorneys' fees and related expenses;

    E.    For an award of prejudgment and post-judgment interest;

    F.    For an award of Plaintiff's costs of suit incurred herein; and,

    G.    For an award of such other relief as the Court may deem just and proper.

**REQUEST FOR JURY TRIAL**

134.    Plaintiff demands a jury trial on all claims and issues set forth herein.

DATED this 3rd day of March 2017.

                              ROBAINA & KRESIN PLLC

                              By /s/ Thomas M. Rogers
                                    Thomas M. Rogers
                                    Meenoo Chahbazi
                                    Attorneys for Plaintiff Lydia Garcia